J-S72013-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: C.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.S., BIOLOGICAL MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1256 MDA 2018 |

Appeal from the Decree Entered July 10, 2018
In the Court of Common Pleas of Lackawanna County Orphans' Court at
No(s):  A-17 of 2018

BEFORE:  BOWES, J., SHOGAN, J., and KUNSELMAN, J.

MEMORANDUM BY BOWES, J.:                **FILED: JANUARY 17, 2019**

J.S. ("Mother") appeals from the order dated June 27, 2018, and entered on July 10, 2018, in the Court of Common Pleas of Lackawanna County, that granted the petition of the Lackawanna County Office of Youth and Family Services ("OYFS"), and involuntarily terminated her parental rights to her son, C.S.[1]  After careful review, we affirm.

C.S. was born in December of 2015.  OYFS became involved with the family in February of 2017 when it received a referral regarding bruises on C.S.'s face.  N.T., 5/17/18, at 15.  Further investigation revealed multiple bruises on C.S.'s cheeks, eyelids, forearm, ears, and the bridge of his nose.  *Id*.  Additionally, C.S. had multiple broken bones in different stages of healing, including fractures to his left arm, right leg, and skull.  *Id*. at 15.  Mother,

---

[1] The birth father, A.P., relinquished his parental rights voluntarily.

who suffers from an undisclosed intellectual disability, had no explanation for C.S.'s injuries. *Id*. at 16. Pursuant to a shelter care order dated February 27, 2017, the court granted OYFS legal and physical custody of C.S. The order anticipated that C.S. would be placed in foster care upon his release from the hospital. On May 11, 2017, the court entered an order adjudicating C.S. dependent.

As a result of C.S.'s injuries, Mother was charged with endangering the welfare of children, simple assault, and recklessly endangering another person. N.T., 5/17/18, at 17. On July 24, 2017, Mother entered a plea of *nolo contendere* to the charge of simple assault, acknowledging that she would not contest that she "did attempt to cause or did intentionally, knowingly, or recklessly cause bodily injury to C.S., a then 14-month-old male. Specifically [Mother] did cause injuries, including facial bruises and bone fractures." N.T., Plea Hearing, 7/24/17, at 3.

OYFS implemented a family service plan ("FSP") that required Mother to obtain a mental health evaluation and comply with all recommendations, stabilize her mental health, engage in intellectual disability services, complete an evaluation with Advocacy Alliance to identify support services, appropriately respond to C.S., both emotionally and physically, participate in a safe care program and a mothers group, and apply the parenting skills learned. N.T., 5/17/18, at 27-28. Mother obtained full compliance with the FSP. *Id*. at 33. However, her progress toward reunification was minimal due

to her inability to apply the skills learned through the services that were provided. *Id*. at 33-34.

On April 25, 2018, OYFS filed a petition to involuntarily terminate Mother's parental rights to C.S. pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5) and (8) and § 2511(b). The trial court conducted hearings on the petition on May 17, 2018 and June 27, 2018. C.S. was represented by Attorney Kevin O'Hara, who acted as his guardian *ad litem* ("GAL") throughout the dependency proceedings.[2] OYFS presented the testimony of Urica Carver, OYFS caseworker; Lisa Kanavy, OYFS visitation supervisor; Stefanie

---

[2] In ***In re T.S.***, 192 A.3d 1080 (Pa. 2018), our Supreme Court reiterated that 23 Pa.C.S. § 2313(a) requires that counsel be appointed to represent the legal interests of any child involved in a contested involuntary termination proceeding. The Court continued that a guardian *ad litem* who is an attorney may act as legal counsel pursuant to § 2313(a) as long as the dual roles do not create a conflict between the child's legal interest, which is synonymous with his preferred outcome, and his best interests. In addressing a potential conflict in that case, the High Court concluded that the trial court did not err in allowing the guardian *ad litem* to act as the sole representative during the involuntary termination of parental rights proceeding because the children, ages two and three, respectively, were incapable of expressing their preferred outcome. The Court reasoned,

> [I]f the preferred outcome of the child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act that counsel be appointed 'to represent the child,' 23 Pa.C.S. § 2313(a), is satisfied where the court has appointed an attorney-[GAL] who represents the child's best interests during such proceedings.

*Id.* at 1093-94. Given that C.S. was two years old at the time of the hearing in the case at bar, we discern no conflict between his legal interest and best interests.

Calachino, intellectual disabilities support coordinator for Wayne County Behavioral and Developmental Program; and Patrick Quinn, director of program operations at The Arc of Northeastern Pennsylvania. Mother, represented by counsel, testified on her own behalf. Further, Mother presented the testimony of Tamara Fisher, Mother's habilitation specialist through Holcombe Behavioral Health System. On July 10, 2018, the trial court entered an order involuntarily terminating Mother's parental rights to C.S.

Thereafter, on July 27, 2018, Mother filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

Mother raises the following issues for our review:

A. Whether the trial court erred as a matter of law and/or manifestly abused its discretion in determining the agency sustained its burden of proving the termination of Mother's parental rights is warranted under Sections 2511(a)(1), 2511(a)(2), 2511(a)(5) and/or 2511(a)(8) of the Adoption Act?

B. Even if this Court concludes the agency established statutory grounds for the termination of Mother's parental rights, whether the trial court nevertheless erred as a matter of law and/or manifestly abused its discretion in determining the agency sustained its additional burden of proving the termination of Mother's parental rights is in the best interests of the child?

Mother's brief at 5.

We review these claims mindful of our well-settled standard of review:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law

or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis:

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

In this case, the trial court order did not identify the sections of the Adoption Act under which it terminated Mother's parental rights. However, the court's opinion and on-the-record statements from the bench confirm that it terminated Mother's parental rights pursuant to § 2511(a)(2) and (b). This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of § 2511(a) as well as

§ 2511(b).  *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

The relevant sections provide:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

. . . .

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

Our Supreme Court set forth our inquiry under § 2511(a)(2) as follows:

As stated above, § 2511(a)(2) provides statutory grounds for termination of parental rights where it is demonstrated by clear and convincing evidence that "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions

and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." . . .

This Court has addressed incapacity sufficient for termination under § 2511(a)(2):

A decision to terminate parental rights, never to be made lightly or without a sense of compassion for the parent, can seldom be more difficult than when termination is based upon parental incapacity. The legislature, however, in enacting the 1970 Adoption Act, concluded that a parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.

**In re Adoption of S.P.**, 47 A.3d 817, 827 (Pa. 2012) (citations omitted).

This Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. **In re A.L.D.** 797 A.2d 326, 337 (Pa.Super. 2002). A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. **Id**. at 340.

In addressing § 2511(a), the trial court observed that Mother engaged in the services provided by OYFS. Trial Court Opinion, 8/2/18, at 2. However, it found Mother did not demonstrate that she gained any skills from the services. **Id**. The court concluded Mother was unable to care for C.S.'s basic and medical needs, or to provide for his safety. **Id**. Additionally, at the conclusion of the hearing, the court noted, "[M]other, I think, maybe is at a point where she could take care of herself more independently, but I'm sure she can't take care of a child." N.T., 6/27/18, at 213.

Mother asserts the trial court erred because OYFS did not explore the extent of Mother's intellectual disabilities, her limitations, or available programming to assist Mother. Mother's brief at 21. Mother argues that OYFS should have undertaken a psychological evaluation of Mother to identify her limitations. *Id*. at 22. Mother faults OYFS for concluding that Mother did not make enough progress when it had insufficient information about her limitations. *Id*. She contends that she progressed towards independence with the assistance of the supports available to her. *Id*. at 22-23. Accordingly, Mother argues the court erred in concluding that the causes of her parental incapacity, abuse, neglect or refusal cannot or will not be remedied. *Id*. at 23.

The record supports the trial court's conclusion that OYFS established, by clear and convincing evidence that Mother suffers from a parental incapacity that she cannot or will not remedy. C.S. came into OYFS's care as a result of physical abuse, *i.e.*, multiple bruises, broken bones in different stages of healing, and a lack of any immediate explanation for those injuries from Mother. N.T., 5/17/18, at 15-16. Later, Mother proffered a variety of explanations for the injuries, including asserting C.S. returned from his maternal grandparents' home injured, that 14-month-old C.S. tripped and fell playing cops and robbers, that he fell on his own, or that she fell while holding him. *Id*. at 22-23, N.T., 6/27/18, at 105, 163. However, the medical records belied these alternative scenarios. C.S.'s doctor at Geisinger opined that C.S.'s arm was fractured by a twisting motion and his leg and clavicle were

fractured by forced trauma. N.T., 5/17/18, at 21. While the causes of the rib and head fractures could not be determined, Mother ultimately entered a plea of *nolo contendere* to simple assault. *Id*.at 17, 21.

During the hearing, Ms. Carver, the OYFS caseworker assigned to the family, testified that Mother was fully compliant with her FSP goals, participated in the required courses, took the initiative to enroll herself in additional programs for parenting, CPR, and fire safety. *Id*. at 32-33, 55-56. However, Mother's progression stalled because she was unable to apply the skills she learned. *Id*. at 33-34.

As it relates to safety concerns in Mother's home, Ms. Carver indicated that Mother did not recognize common hazards. When Mother moved to a new home, Ms. Carver observed that Mother had open heaters, the stairs were not blocked off, and electrical plugs were not covered. *Id*. at 34. The conditions remained for several months until Ms. Carver finally requested that Mother fix the issues. *Id*. at 63. Mother complied, but only because she was told to, not because she understood the risks. *Id*. at 34-35, 64. Ms. Carver also confirmed that Mother did not progress to unsupervised visits because of concerns about C.S.'s safety and her ability to care for C.S. *Id*. at 25-26.

Ms. Carver opined that Mother would need 24-hour supervision to care for C.S. and could not independently care for him in the near future due to the safety concerns. *Id*. at 38, 61. Ms. Carver did not believe that additional time would help because safety and supervision were the primary concerns

and Mother's ability to provide safety and supervision did not improve despite the services offered. *Id*. at 68-69. For example, during the period that C.S. was convalescing from the non-accidental injuries that are the genesis of OYFS's involvement with the family, Mother never thought to inquire about his recovery. *Id*. at 24.

Lisa Kanavy, a visitation supervisor for OYFS, testified that Mother attended every visit and brought appropriate meals. N.T., 6/27/18, at 20-21, 33. However, visits did not progress beyond line-of-sight because of safety concerns. *Id*. at 19. Mother would place C.S. in a highchair and ignore him while she went to the kitchen to make lunch. *Id*. at 20. Further, a recurring issue was Mother's failure to cut food up so it was small enough that C.S. could not choke on it. *Id*. at 20-21. Additionally, Mother would not immediately follow C.S. when he left the room. *Id*. at 19. Ms. Kanavy recounted an incident where, after getting changed, C.S. was crawling on the floor of the bathroom, left the room, entered the kitchen, and retrieved a toy before Mother could get to him. *Id*. at 35.

Ms. Kanavy sought to teach Mother about health and safety issues. One of the barriers was that Mother never acknowledged that C.S.'s injuries were serious, asserting that broken bones and bruises did not constitute serious injuries. *Id*. at 9-10, 16-17. Further, Mother did not believe that keeping C.S. safe was her role, claiming her responsibility was to provide shelter, food, and clothing. *Id*. at 17, 42. Ms. Kanavy taught the course on safe care, which

included three modules, safety, health, and parent-child interaction, followed by a test. *Id*. at 12. Ms. Kanavy acknowledged that she has not taught another individual with an intellectual disability, *id*. at 77, but she was aware of Mother's status and attempted to assist Mother by explaining concepts to her from different points of view. *Id*. at 40-41. Additionally, the test following the first module was adjusted to account for Mother's intellectual disability by explaining questions in more detail and allowing Mother to ask questions. *Id*. at 45. Mother failed the first test and, after additional education, failed it again. *Id*. at 13. Mother answered 30% of the safe care questions correctly. *Id*. at 44. A score of 70% is considered a passing score. *Id*. at 68. Because Mother could not pass the first module, they did not pursue the other modules. *Id*. at 15. Ms. Kanavy testified that OYFS would not return C.S. to Mother's care without Mother successfully completing all three modules. *Id*.

The foregoing evidence of record confirms that Mother did not make sufficient progress toward reunification.[3] C.S. came into care as a result of serious injuries that occurred while he was in Mother's care. Despite receiving

---

[3] Mother complains that, to the extent that her progress was insufficient, it was the result of OYFS's failure to employ reasonable efforts toward reunification in light of her intellectual disability. We disagree. The record supports OYFS's efforts to account for Mother's disability. Moreover, even if it did not, an agency's failure to provide reasonable efforts is not a basis for denying a petition to terminate parental rights. *See In re D.C.D.*, 105 A.3d 662, 676 (Pa. 2014) ("Superior Court erred in reversing the trial court's termination of Father's parental rights as a result of CYS's failure to provide reasonable efforts to enable Father to reunify with Child").

services for over a year, Mother still could not provide safety for C.S., even in a supervised setting. The testimony of Ms. Carver and Ms. Kanavy confirms that Mother's repeated and continued incapacity, abuse, neglect or refusal caused C.S. to be without essential parental care, control or subsistence necessary for his physical or mental well-being. Further, the causes of Mother's incapacity, abuse, neglect or refusal cannot or will not be remedied. Accordingly, we discern no abuse of discretion by the trial court in terminating Mother's parental rights pursuant to § 2511(a)(2).

We next determine whether termination was proper under § 2511(b). This Court has stated that the focus in terminating parental rights under § 2511(a) is on the parent, but it is on the child pursuant to § 2511(b). **See**

**In re Adoption of C.L.G.**, 956 A.2d 999, 1008 (Pa.Super. 2008) (*en banc*). In reviewing the evidence in support of termination under § 2511(b), our Supreme Court has stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." **In re K.M.**, 53 A.3d 781, 791 (Pa. Super. 2012). In **In re E.M.**, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. **In re K.M.**, 53 A.3d at 791.

**In re: T.S.M.**, 71 A.3d 251, 267 (Pa. 2013).

- 12 -

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, [§] 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." *In re K.Z.S.*, 946 A.2d 753, 762 (Pa.Super. 2008).

A parent's abuse and neglect are likewise a relevant part of this analysis:

> [C]oncluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

*In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa.Super. 2008) (internal citations and quotation marks omitted).

Thus, the court may emphasize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental

- 13 -

rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of . . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa.Super. 2004) (internal citations omitted).

With respect to § 2511(b), Mother argues that termination did not meet C.S.'s needs and welfare. Mother's brief at 23. Mother highlights her own testimony, as well as that of Ms. Fisher, to assert there is a bond between Mother and C.S. *Id*. at 24. Further, Mother faults OYFS for failing to account for her intellectual limitations. *Id*. at 25.

The record supports the trial court's conclusion that termination of Mother's parental rights best meets C.S.'s needs and welfare. Ms. Carver, the OYFS caseworker, testified that C.S. has been in his foster home for 14 months. N.T., 5/17/18, at 67. C.S. has his needs met by his foster parents and the family loves and cares for each other. *Id*. Ms. Carver observed C.S. playing and laughing with his foster parents and described them as very nurturing. *Id*. at 35, 66. Ms. Carver opined that it is in C.S.'s best interest for Mother's parental rights to be terminated. *Id*. at 67. Similarly, Ms. Kanavy, the OYFS visit supervisor, opined that Mother is bonded to C.S., but she did not believe that C.S. is bonded to Mother. N.T., 6/27/18, at 61. Ms.

Kanavy observed C.S. call Mother "mommy," but C.S. also referred to case aides as "mommy." *Id*. at 30. She acknowledged C.S., at times, seeks comfort from Mother during visits, but she did not see C.S. run to Mother as she would expect if C.S. was bonded to Mother. *Id*. at 31. Ms. Kanavy opined it was in C.S.'s best interest to establish permanency with his foster parents.[4] *Id*. at 34.

Here, the trial court credited OYFS's evidence and concluded termination of Mother's parental rights best serves C.S.'s developmental, physical and emotional needs and welfare. The record confirms that C.S. resides in a loving home, with foster parents that Mother acknowledges are doing a good job raising C.S. The trial court noted C.S. "has bonded with his foster parents rather than with Mother." Trial Court Opinion, 8/2/18, at 2. While Mother may profess to love C.S., a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *In re Z.P.*, 994 A.2d at 1121. As we stated, a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting." *Id.* at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." *In re B.,*

---

[4] Mother acknowledged that the foster parents are "wonderful people" and have done a good job raising C.S. N.T., 6/27/18, at 191.

- 15 -

**N.M.**, 856 A.2d at 856 (citation omitted). Upon our review of the record, we discern no abuse of discretion in the trial court's conclusion that terminating Mother's parental right serves C.S.'s developmental, physical and emotional needs and welfare pursuant to § 2511(b).

Accordingly, for all of the foregoing reasons, we find that the record sustains the trial court's determination that OYFS established the statutory grounds to terminate Mother's parental rights pursuant to § 2511(a)(2) and confirms that terminating Mother's parental rights best satisfies C.S.'s developmental, physical, and emotional needs and welfare under § 2511(b). Thus, we affirm the trial court order terminating Mother's parental rights to C.S. pursuant to § 2511(a) and (b).

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 01/17/2019